IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JONATHAN PAUL BOYD | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:10-cv-688-MEF |
| | ) | |
| v. | ) | |
| | ) | |
| CAROL H. STECKEL, in her official | ) | (WO – PUBLISH) |
| capacity as Commissioner of the Alabama | ) | |
| Medicaid Agency, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on the Amended Motion for Preliminary Injunction and Expedited Hearing, (Doc. # 15), filed on September 29, 2010 by Plaintiff Jonathan Paul Boyd ("Boyd"). The Court has carefully considered all submissions and argument in support of and in opposition to the motion and has convened a hearing on the matter. For the reasons set forth below, the motion for a preliminary injunction is due to be DENIED.

## JURISDICTION AND VENUE

This Court has jurisdiction over the case pursuant to 28 U.S.C. §§ 1331 and 1334(a). Declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 as well as Federal Rule of Civil Procedure 65. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant Carol H. Steckler, in her official capacity as Commissioner of the Alabama Medicaid Agency ("Commissioner Steckel"), resides in this district.

## FACTS[1] AND PROCEDURAL HISTORY

On September 29, 2010, Boyd sued Commissioner Steckel for alleged violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, as well as its implementing regulations, and violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations. (Doc. # 14, at 11–12, ¶¶ 57, 60). Specifically, Boyd alleges that Commissioner Steckel has failed to properly assess and provide the Medicaid services needed to permit Boyd to live in the community, as opposed to the nursing home in which he resides. *Id.* at 12–13, ¶¶ 58, 61. On September 29, 2010, Boyd also filed an Amended Motion for Preliminary Injunction and Expedited Hearing. (Doc. # 15). This motion was granted to the extent that it sought an expedited hearing. (Doc. # 17). On October 12, 2010, the United State of America filed a statement of interest and brief in support of Boyd's motion for a preliminary injunction. (Doc. # 25). The hearing for the preliminary injunction motion was held on October 13, 2010.

## A. Medicaid

Title XIX of the Social Security Act of 1965 established Medicaid. 79 Stat. 343, as amended, 42 U.S.C. §§ 1396 *et seq.* "Medicaid is a joint [S]tate-[F]ederal funding program for medical assistance in which the Federal Government approves a [S]tate plan for the funding of medical services for the needy and then subsidizes a significant portion

---

[1] This recitation of facts is based on the allegations in the Amended Complaint, (Doc. # 14), and the evidence and testimony submitted by the parties in support of and in opposition to the motion for a preliminary injunction.

of the financial obligations the State has agreed to assume."  *Alexander v. Choate*, 469

U.S. 287, 289 n.1 (1985).  Medicaid is a voluntary program whereby the States need not

participate.  *Id.*  However, should a State choose to participate, then it "must comply with

the requirements of Title XIX and applicable regulations."  *Id.*

Under the Medicaid Act, states may choose to operate home and community-based

waiver programs for individuals to avoid institutionalization.  42 U.S.C. § 1396n(c).

Pursuant to this section:

> The Secretary may by waiver provide that a State plan approved under this title
> may include as 'medical assistance' under such a plan payment for part or all
> of the cost of home or community-based services (other than room and board)
> approved by the Secretary which are provided pursuant to a written plan of
> care to individuals with respect to whom there has been a determination that
> but for the provision of such services the individuals would require the level
> of care provided in a hospital or a nursing facility . . . the cost of which could
> be reimbursed under the State plan.

*Id.* § 1396n(c)(1).  Such waiver programs "are intended to provide the flexibility needed

to enable States to try new or different approaches to the efficient and cost-effective

delivery of health care services, or to adapt their programs to the special needs of

particular areas or groups of recipients."  42 C.F.R. § 430.25(b).  However, these waiver

programs must be cost-neutral in the aggregate—i.e. the cost of operating the waiver

system must not exceed what the cost would be to provide Medicaid services without the

waiver program.  42 U.S.C. § 1396n(c)(2)(D) ("[U]nder such [a] waiver the average per

capita expenditure estimated by the State in any fiscal year for medical assistance

provided with respect to such individuals does not exceed 100 percent of the average per

3

capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted . . . ."); *see also* 42 C.F.R. § 441.302(e)–(f).

The Medicaid Act also provides that States may deviate from certain other Medicaid requirements.  42 U.S.C. § 1396n(c)(3).  For example, an approved waiver program may also include a waiver of the Medicaid requirements of "statewideness," "comparability," and "income and resource rules applicable in the community."  *Id.*  More specifically, under the applicable federal regulations, "the State may exclude those individuals [from waiver programs] for whom there is a reasonable expectation that home and community-based services would be more expensive than the Medicaid services the individual would otherwise receive."  50 Fed. Reg. 10,013 (Mar. 13, 1985).  Similarly, the State "can choose to provide home and community-based services to a limited group of eligibles, such as the developmentally disabled" and need not "provide the services to all eligible individuals who require an ICF [intermediate care facility] or SNF [skilled nursing facility] level of care."  *Id.*

The Medicaid statutes and regulations also provide for caps on the number of persons served under a waiver program for a given year—that is, they "contemplate that State waiver plans will limit the number of eligible participants in any year."  (Doc. # 20, at 23) (citing 42 U.S.C. § 1396n(c)(9) ("*In the case of any waiver under this subsection which contains a limit on the number of individuals who shall receive home or*

*community-based services*, the State may substitute additional individuals to receive such services to replace any individuals who die or become ineligible for services under the State plan."); 42 C.F.R. § 441.303(f)(6) ("The State *must* indicate the number of unduplicated beneficiaries which it intends to provide waiver services in each year of its program. *This number will constitute a limit on the size of the waiver* program unless the State requests and the Secretary approves a greater number of waiver participants in a waiver amendment.") (emphasis added)).

**B. Alabama's Waiver Programs**

The State of Alabama ("Alabama") has chosen to participate in Medicaid and to provide certain waiver programs. (Doc. # 20, at 20). Currently, Alabama operates six waiver programs with varying purposes, qualifying criteria, services provided, and enrollment limits: (1) the Elderly & Disabled ("E&D") Waiver; (2) the Intellectual Disabilities ("ID") Waiver;[2] (3) the Living at Home ("LAH") Waiver;[3] (4) the State of Alabama Independent Living ("SAIL") Waiver; (5) the HIV/AIDs Waiver;[4] and (6) the

---

[2] The ID Waiver (formerly known as the Mental Retardation ("MR") Waiver) is available only for persons with intellectual disabilities. (Doc. # 19 Ex. C, Chappelle Aff. ¶ 9). As such, it is inapplicable in the instant case.

[3] The LAH Waiver is available only for persons with intellectual disabilities. (Doc. # 19 Ex. C, Chappelle Aff. ¶ 9). As such, it is inapplicable in the instant case.

[4] The HIV/AIDS Waiver is available only for persons diagnosed with HIV, AIDS, and related illnesses. (Doc. # 19 Ex. C, Chappelle Aff. ¶ 10). As such, it is inapplicable in the instant case.

Technology Assisted ("TA") Waiver for Adults.[5]  Doc. # 20, at 24–25; *see also* Doc. # 16 Ex. D.

The SAIL Waiver program provides numerous services for persons with specific medical diagnoses, which includes quadriplegia.  Doc. # 16 Ex. D.  Such services include personal care, personal assistance service, environmental accessibility adaptations, medical supplies, and assistive technology.  *Id.*  However, there are limitations on the extent of such services.  For example, "reimbursement for in-home personal care and assistance is limited to 25 hours per week."  (Doc. # 19 Ex. C, Chappelle Aff. ¶ 13).  Moreover, while personal care is covered to some extent under the SAIL waiver, "skilled nursing care is not available at all under the SAIL Waiver . . . ."  *Id.*  The SAIL Waiver program is capped at 660 persons, although the record is unclear as to whether the program is full.

The E&D Waiver program also provides numerous services "to individuals that would otherwise require the level of care available in an intermediate care facility."  (Doc. # 16 Ex. D).  Such services include case management, homemaker services, personal care, adult day health, and respite care (skilled and unskilled).  *Id.*  As with the SAIL waiver, there are limitations on the extent of these services.  For example, "'skilled'

---

[5]  The TA Waiver for Adults is "available only for persons who received private duty nursing services through the EPSDT Program under the Medicaid State Plan prior to turning 21 years of age."  Doc. # 19 Ex. C, Chappelle Aff. ¶ 11.  Because there is no evidence on the record establishing whether Boyd received such services, the TA Waiver for Adults is inapplicable at this juncture.  *Id.*

care (provided by a nurse or other health-care professional), is not available on a regular basis under the E&D Waiver, but may only be provided as *respite* care (relief for a regular caregiver)." (Doc. # 19 Ex. C, Chappelle Aff. ¶ 14). Additionally, this respite care is limited to 720 hours per year. Although there is no hourly limit on homemaker services, personal care and adult companion services, these "would not include administration of medicine . . . ." *Id.* The E&D Waiver is capped at 9,205 people and has remained at the cap since 2008. (Doc. # 16, at 5). Additionally, according to the Kaiser Commission, there are over 7,000 persons on the E&D Waiver waiting list. *Id.*

## C. Boyd's Facts

According to the Amended Complaint, Boyd is a 34 year-old man who became paralyzed after an accident in October of 1995, which broke his spine and rendered him tetraplegic—i.e. leaving him without the use of his arms and legs. (Doc. # 14, at 1, ¶ 1–2; Doc. # 20, at 8). Following his accident, Boyd lived with his mother and stepfather for eleven years, with his mother acting as his primary care giver. (Doc. # 14, at 1, ¶ 3; Doc. # 20, at 8). During this time, Boyd "was eligible for and received community-based Medicaid waiver services to complement the care being provided by his mother." (Doc. # 14, at 1, ¶ 3; Doc. # 20, at 8). However, after his mother was no longer able to provide the required care, Boyd entered the nursing facility—Chandler Health and Rehab Center in Alabaster, Alabama—where he has lived since December of 2006. (Doc. # 14, at 1, ¶ 3; Doc. # 20, at 8). Because community-based services and reimbursement for nursing

7

home care are mutually exclusive alternatives, the community-based Medicaid waiver services were discontinued when Boyd entered the nursing facility.  (Doc. # 14, at 4, ¶ 19; Doc. # 20, at 8–9).

Currently, Boyd is eligible for and receives Medicaid, which pays for his nursing home services.  (Doc. # 14, at 4, ¶ 20; Doc. # 20, at 9).  For ambulation, Boyd uses a motorized wheelchair which he controls with a "sip and puff" device.  (Doc. # 14, at 4, ¶ 21).  At the nursing home, Boyd "receives assistance with his activities of daily living, including assistance with taking medications, bathing, dressing, toileting, feeding, and transferring from and to his bed and into and out of his wheelchair."  *Id.* at 4–5, ¶ 22.  He also receives assistance with basic household chores, for his bowel program (twice weekly), and for changing his catheter (twice monthly).  *Id.*

After his accident, Boyd returned to college and graduated in 2007 with a bachelor of fine arts from the University of Montevallo.  (Doc. # 14 at 5, ¶ 25; Doc. # 20, at 9).  His nursing home is 13 miles from the university.  (Doc. # 14, at 5, ¶ 27).  While earning his bachelor's degree, Boyd took public transportation (ClasTran) to and from classes.  (Doc. # 14, at 5, ¶ 27; Doc. # 20, at 9).  The Alabama Department of Rehabilitation Services ("Rehab Services") paid for this use of ClasTran.  (Doc. # 20, at 9).  Boyd alleges that this public transportation was, and still is, available only until 3:30p.m.  (Doc. # 14, at 5–6, ¶ 27).

In 2010, Boyd was admitted to a University of Montevallo graduate program

seeking a Master's degree in community counseling. (Doc. # 14, at 5, ¶ 26; Doc. # 20, at

9). He began this program in September of 2010. (Doc. # 14, at 5 ¶ 26). Because the

graduate program offers classes only at night, Boyd alleges that he is unable to take the

ClasTran and must "rely upon and pay a nursing home maintenance worker all of his

scholarship funds ($500 for the semester) to transport him to and from campus for his

classes." *Id.* at 6, ¶ 28; *see also* Doc. # 20, at 9.[6]  Additionally, Boyd claims that he

borrows money from his brother to pay others $20 per trip for six additional trips per

semester, which are needed in order to complete required assignments. (Doc. # 14, at 6, ¶

29). Essentially, Boyd wishes to receive community-based services necessary for him to

live in the community, to be able to take more than two classes per semester towards his

graduate degree, and to enjoy other University functions.[7]  *Id.* ¶¶ 30–31. He has located

rental housing near campus which meets his accessibility needs but is unable to secure the

rental unless he knows that the necessary community-based services will be provided. *Id.*

---

[6] Commissioner Steckel argues that Boyd's "assertion that he has been 'forced' into this position is disingenuous, however, as he failed to request assistance from Rehab Services—which has a history and current practice of assisting him with transportation." (Doc. # 20, at 10). At the October 13, 2010 hearing, Boyd admitted that he was satisfied with his current transportation arrangements. However, he also claimed that these arrangements could not continue past the spring semester, after which he alleges that he will lose the $500 per semester scholarship he currently uses to pay the nursing home employee.

[7] Specifically, Boyd contends that he "is experiencing an increase in time, effort and expense for him to complete his graduate degree and is being prevented from participating in aspects of college life enjoyed by other graduate students." *Id.* at 6, ¶ 31. He is currently taking two nighttime classes for his graduate program, but he would like to take four. *Id.* ¶ 30. Boyd also points out that he is unable to attend other University functions such as athletic events, author readings, theatrical performances, and musical performances. *Id.*

at 6–7, ¶ 32.[8]  Boyd also complains of the conditions and atmosphere of the nursing

home.  *Id.* at 7–8, ¶¶ 34–38.[9]

Boyd applied for a Medicaid waiver program in October of 2008 and has been on a

waiting list for services since that time.  *Id.* at 8, ¶ 41.  He also "recently renewed his

request for services by asking [Commissioner Steckel] to make reasonable modifications

to her waiver programs and provide him with waiver services including 10 hours per day

of assistance with activities of daily living, assistance with his bowel program twice per

week, assistance with changing his catheter twice per month and necessary equipment and

---

[8] Because "accessible rental housing is difficult to locate and secure," Boyd alleges that he "needs to act as soon as possible in order to secure rental housing."  *Id.* at 7–8, ¶ 32.

[9] Specifically, Boyd alleges that, since he moved into the nursing home in December of 2006, he has had five decubitus ulcers ("pressure sore[s]").  *Id.* at 7, ¶ 34.  In the eleven years when his mother was his primary care giver, he only had one.  *Id.*  Furthermore, Boyd contends that he "must return to the facility by a specific time in the evening, which limits his socializing with friends and having overnight stays with friends."  *Id.* ¶ 35.  Because he is a Medicaid resident in a nursing home, only $30 of his $897 monthly Social Security Disability check is available for his personal expenses, again limiting his ability to socialize or have snacks. *Id.*
   He claims that "virtually all of the [other] residents are disabled and most are much older than [him]" taking away the "simple pleasure of being around people his own age who have similar interests and activities."  *Id.* at 8, ¶ 37.  As such, he does not take part in many of the nursing home's activities because they are "geared toward octogenarians."  *Id.*
   He also points out that he "must eat when and what the facility provides and must transfer to and from his bed, shower, toilet, and dress on the staff's schedule."  *Id.* at 7, ¶ 36.  To accommodate others with their morning routines, the nursing home staff often pushes Boyd's back until 11 a.m. or later.  *Id.*  Thus, he contends that he "is unable to get out of bed until 11 a.m. unless he schedules his activities a few days in advance."  *Id.* at 7–8, ¶ 36.  This also applies to his evening routine.  *Id.* at 8, ¶ 36.
   Finally, Boyd complains that "[t]here is little or no privacy" in the nursing home, where "[t]here is constant noise, screaming and crying."  *Id.* ¶ 38.  He claims that the nursing home residents "are often not dressed and are exposed" and "[t]here is a pervasive unpleasant disinfectant odor."

care supplies." *Id.* at 8–9, ¶ 41.  Because Commissioner Steckel has failed to provide

such community-based services, Boyd alleges that he is forced to "continue to reside in a

Medicaid-funded nursing facility instead of the community."[10]

## DISCUSSION

### A.  Preliminary Injunction Standard

The purpose of a typical preliminary injunction is prohibitive in nature in that it is

"'merely to preserve the relative positions of the parties until a trial on the merits can be

held.'"  *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (quoting *Univ. of.*

*Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Mercedes-Benz U.S. Int'l, Inc. V.*

*Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009) ("Typically, a preliminary

injunction is prohibitory and generally seeks only to maintain the status quo pending a

trial on the merits.") (citations omitted).  The burden on the party seeking a typical,

prohibitive preliminary injunction is particularly high.  *All Care Nursing Serv., Inc. v.*

*Bethesda Mem. Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) ("Preliminary

injunctions are issued when drastic relief is necessary to preserve the status quo.") (citing

*Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Bannum, Inc. v. City of Fort*

*Lauderdale, Fla.*, 657 F. Supp. 735 (S.D. Fla. 1986)), cert. denied, *Quality Prof'l*

*Nursing, Inc. v. Bethesda Mem'l Hosp., Inc.*, 526 U.S. 1016 (1999); *see also Lambert*,

695 F.2d at 539 ("[A preliminary injunction's] grant is the *exception rather than the rule*,

---

[10]  He describes this as being "unnecessarily institutionalized."  *Id.* at 8, ¶¶ 40–41.

and plaintiff must *clearly* carry the burden of persuasion.") (emphasis added).  However,

where, as here, "a preliminary injunction goes beyond the status quo and seeks to force

one party to act, it becomes a mandatory or affirmative injunction and the burden placed

on the moving party is increased." *Mercedes-Benz*, 605 F. Supp. 2d at 1196 (citing

*Exhibitors Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir.

1971), reh'g denied, 520 F.2d 943 (5th Cir. 1975), cert. denied, 423 U.S. 1054 (1976)).[11]

For such mandatory injunctions, relief should be granted "*[o]nly in rare instances*."

*Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) (emphasis added); *see also*

*Mercedes-Benz*, 605 F. Supp. 2d at 1196.

A preliminary injunction is "an extraordinary and drastic remedy" that cannot be

granted unless the moving party clearly establishes the following four prerequisites:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable
> injury will be suffered unless the injunction issues; (3) the threatened injury
> to the movant outweighs whatever damage the proposed injunction may
> cause the opposing party; and (4) if issued, the injunction would not be
> adverse to the public interest.

*Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc), reh'g denied, 234 F.3d

1218 (11th Cir. 2000) .  If the moving party cannot clearly establish any one of the four

required elements, then a preliminary injunction should not be granted.  *Bethel v. City of*

*Montgomery*, No. 2:04cv743-MEF, 2010 U.S. Dist. LEXIS 24949 at *11–12 (M.D. Ala.

---

[11] Unless subsequently overruled, decisions of the old Fifth Circuit before October 1,
1981 are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th
Cir. 1981) (en banc).

Mar. 2, 2010) ("A preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant *clearly* carries the burden of persuasion as to *all* prerequisites.") (emphasis in original) (Coody, J.) (citations omitted); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (holding that the moving party's failure to demonstrate a substantial likelihood of success on the merits defeated the party's motion for a preliminary injunction, regardless of the party's ability to establish any of the other elements).  Because this Court finds that Boyd has failed to establish a substantial likelihood of success on the merits sufficient justify the use of such an extraordinary remedy as a mandatory preliminary injunction, this motion is due to be DENIED.

## B.  Substantial Likelihood of Success on the Merits

### i.  *The Statutes and Regulations*

Section 504 of the Rehabilitation Act and Title II of the ADA contain similar provisions and are enforced by similar implementing regulations.  Section 504 provides, in part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."[12]   29 U.S.C. § 794(a).  Its

---

[12] Neither party disputes "that the Federal Government funds a substantial portion of what Alabama spends on Medicaid."  (Doc. # 20, at 18); *see also Alexander*, 469 U.S. at 301 ("Medicaid is a joint state-federal funding program for medical assistance in which the Federal Government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the State has agreed to assume.").

implementing regulation states that "[r]ecipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).  Finally, Section 504 contains a fundamental-alteration defense for the recipient of federal funds.  *Id.* § 41.53 ("A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.").

Similarly, Title II of the ADA also prohibits discrimination in the provision of public services.  It provides, in part, that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any [public] entity."  42 U.S.C. § 12132.  Under Title II, "Congress instructed the Attorney General to issue regulations implementing provisions of Title II, including §12131's discrimination proscription."  *Olmstead v. L.S. by Zimring*, 527 U.S. 581, 591 (1999) (citing 42 U.S.C. § 12134(a)).  The *Olmstead* Court further explained:

> One of the §504 regulations requires recipients of federal funds to 'administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.' 28 CFR § 41.51(d) (1998).  As Congress instructed, the Attorney General issued Title II regulations . . ., including one modeled on the § 504 regulation just quoted; called the 'integration regulation,' it reads:
>> 'A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.'
> 28 C.F.R § 35.130(d) (1998)

*Id.* at 591–92.  Like § 504, Title II of the ADA provides for a fundamental-alteration

defense.  28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

Indeed, Congress stated in the ADA that "[t]he remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 shall be the remedies, procedures, and rights this title provides to any person alleging discrimination on the basis of disability . . . ." 42 U.S.C. § 12133.  "Because the same standards govern discrimination claims under the Rehabilitation Act and the ADA, [this Court will] discuss those claims together and rely on cases construing those statutes interchangeably." *Allmond v. Akal Sec. Inc.*, 558 F.3d 1312, 1316 n.3 (11th  Cir. 2009), *reh'g en banc denied*, 347 Fed. Appx. 555 (11th Cir. 2009), *cert. denied*, 130 S. Ct. 1139 (2010).

### *ii.* **Analysis**

The Supreme Court's fragmented decision[13] in *Olmstead* remains the seminal case on the ADA's—and therefore the Rehabilitation Act's—anti-discrimination provision.  In

---

[13] The *Olmstead* decision consisted of a majority of five justices—Justices Ginsburg, O'Connor, Souter, and Breyer—joining in Parts I, II, and III.A.  However, only a plurality of four—Justices Ginsburg, O'Connor, Souter, and Breyer—joined in part III.B, which is the main focus of the instant case.  Furthermore, Justice Stevens filed an opinion concurring in part and concurring in the judgment.  Justice Kennedy filed an opinion concurring only in the judgment, in which Justice Breyer joined as to Part I.  Finally, Justice Thomas dissented, joined by Justices Rehnquist and Scalia.

*Olmstead*, the disabled persons were two women with mental illnesses—schizophrenia and a personality disorder, respectively.  527 U.S. at 593.  Both women were voluntarily confined for treatment in a Georgia hospital's psychiatric unit.  *Id.*  Eventually, their treating psychiatrists concluded that one of the community-based programs would be appropriate to meet their treatment needs.  *Id.*  However, after they remained institutionalized, they sued the State under Title II of the ADA, alleging "that the State's failure to place [them] in a community-based program, once [their] treating professionals determined that such placement was appropriate, violated, *inter alia*, Title II of the ADA."  *Id.* at 593–94.  The women requested, amongst other forms of relief, that "the State place [them] in a community care residential program, and that [they] receive treatment with the ultimate goal of integrating [them] into the mainstream of society."  *Id.* at 594.[14]

---

[14] Procedurally, the District Court granted partial summary judgment in favor of the women, holding that the failure to provide community-based services violated Title II of the ADA.  *Olmstead*, 527 U.S. at 954.  The District Court also rejected the State's argument that the failure to provide community-based services was "by reason of" lack of funds, not the women's disabilities.  *Id.*  The court concluded that "unnecessary institutional segregation of the disabled constitutes discrimination *per se*, which cannot be justified by lack of funding."  *Id.*  Finally, the District Court rejected the State's fundamental-alteration defense—namely that it was already using all of its funds to provide services to other disabled persons—noting that the State already provided services of the kind which the women sought and that the provision of such services to the women would cost considerably less than institutionalization.  *Id.* at 595.

The Eleventh Circuit affirmed the judgment, but remanded for reconsideration of the State's lack-of-funds defense.  *Id.*  The appeals court held that, when the treating physician finds community-based services appropriate to meet the needs of a disabled person, then the State must provide such services under the ADA.  *Id.*  Absent such a finding, the Eleventh Circuit held that the ADA does not require deinstitutionalization.  *Id.*  However, the duty to deinstitutionalize was "not absolute" because "fundamental alterations [to the State's Medicaid program] were not demanded."  *Id.*  As such, the Eleventh Circuit remanded so that the State could attempt to prove

### a. Determining Qualification for Community-Based Services: t*he* Olmstead *Majority*

The majority opinion in *Olmstead* addressed *only* two issues: (1) whether the women were discriminated against "by reason of" their disability and (2) whether discrimination under the ADA required a showing that the State treated similarly situated individuals outside of the protected class differently.  *Id.* at 598.  With regards to the second issue, the Court merely stated that it was "satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA."  *Id.*

As to whether there was discrimination "by reason of" disability, the Court emphasized that the ADA specifically identifies "'segregation' of persons with disabilities 'as a form of discrimination.'"  *Id.* at 600 (citing 42 U.S.C. § 12101(a) ("[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continues to be a pervasive social problem."); *Id.* § 1201(a)(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including . . . segregation."))  Thus, the Court held that "unjustified institutional isolation of persons with disabilities is a form of discrimination."  *Id.*  This holding reflected "two evident judgments:" (1) that unnecessary institutional isolation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in

---

that "the additional expenditures necessary to treat [the women] would be unreasonable given the demands of the State's mental health budget."  *Id.*

community life" and (2) that such confinement "severely diminishes everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600–01.  The Court further noted that discrimination also existed because disabled persons "must, because of their disabilities, relinquish participation in community life they could enjoy given reasonable accommodations" in order to "receive needed medical services" whereas non-disabled persons need not make the same sacrifice. *Id.* at 601.

However, the Court also stressed that the ADA does not require deinstitutionalization when the person would be incapable of managing or benefitting from it. *Id.* at 601–02 ("[N]othing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings.").  Thus, as the Court stated:

> The State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting.  *See* 28 C.F.R. § 35.130(d) (public entity shall administer services and programs in "the most integrated setting *appropriate* to the needs of the qualified individuals with disabilities") (emphasis added)); *cf. School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288, 94 L.Ed. 2d 307, 107 S. Ct. 1123 (1987) ("Courts normally should defer to the reasonable medical judgments of public health officials.").

*Id.* at 602 (emphasis added).  Because there was no genuine dispute regarding the qualifications of the women for community-based services—indeed, the State's own professionals determined that such services would be appropriate—the Court found

18

discrimination in the failure to deinstitutionalize.  *Id.*

Here, this Court finds that Boyd cannot establish a *substantial* likelihood of success at this early juncture as to whether he is qualified for community-based services. In his brief in support of the summary judgment motion, Boyd addresses *Olmstead*'s holding that "'unjustified isolation . . . is properly regarded as discrimination based on disability.'" (Doc. # 16, at 10) (quoting *Olmstead*, 527 U.S. at 597).  He then goes on to argue that being in a nursing home severely limits his everyday life activities.  *Id.* at 10–13.   However, the key in *Olmstead* is that the institutionalization must be *unjustified* and *unnecessary*.  527 U.S. at 596–597.  Hence, the *Olmstead* majority required a showing that the women qualified for community-based services—i.e. that community-based services were *appropriate* for them.[15]  *Id.* at 602–03.  This burden was met in that

_____

[15] The *Olmstead* Court's language on this issue is somewhat confusing, since the Medicaid statute refers a "qualified individual with a disability," which is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for receipt of services or the participation in programs or activities provided by the public entity." 42 U.S.C. § 12131(2).  In its brief in support of Boyd's preliminary injunction motion, the United States Department of Justice ("DOJ") contends that Commissioner Steckel's argument on Boyd's qualifications "conflates the question of eligibility with the question of whether the relief sought is a reasonable modification."  (Doc. # 25 at 12).

However, a closer reading of *Olmstead* reveals that the Court's requirement of being qualified for community-based services means that the services are appropriate to meet the individual's needs.  527 U.S. at 602 ("The State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' *for habilitation in a community-based program*.  Absent such qualification, it would be *inappropriate* to remove a patient from the more restrictive setting.") (emphasis added) (citing 28 C.F.R. § 35.130(d) (public entity shall administer services and programs in "the most integrated setting *appropriate* to the needs of the qualified individuals with disabilities") (emphasis added by the Supreme Court)).

Otherwise, the citation to the integration provision and the emphasis on the appropriateness language would be unnecessary and irrelevant.  Additionally, a contrary

case because neither party disputed it.  *Id.*

In the instant case, Boyd has declared what his needs would be should he be provided with community-based services.  Specifically, he states that he will require "ten hours per day of assistance with activities of daily living, assistance with his bowel program twice weekly, assistance with replacement of his catheter twice monthly and necessary equipment and care supplies."  (Doc. # 16, at 14).  He also asserts that Commissioner Steckel "does not dispute that Plaintiff Boyd is a qualified person with a disability who meets the eligibility requirements for Alabama's Medicaid nursing home 'level of care' as well as for its waiver and Medicaid programs."  *Id.* at 7.

In response, Commissioner Steckel admits that Boyd is eligible for *nursing home level of care* but argues that "the issue of whether [Boyd] is qualified for Medicaid Waiver services, insofar as the ADA and Rehab[ilitation] Act define that term, is contested."  (Doc. # 20, at 52 n.31).  Commissioner Steckel has put evidence before this Court in the form of an affidavit by Dr. Robert Moon, ("Dr. Moon"), Medical Director and Deputy Commissioner of Health Systems for the Alabama Medicaid Agency.  (Doc. # 22 Ex. B).  After reviewing Boyd's medical records, Dr. Moon contends that numerous

---

interpretation would mean that a person who qualifies for Medicaid generally would then automatically qualify for community-based services as a "qualified individual with a disability" even if it were not the most appropriate setting for his needs.  Such a result would be contrary to the integration provision's express language.  *See* 28 C.F.R § 35.130(d); 28 C.F.R. § 41.51(d); *see also Olmstead*, 527 U.S. at 607 (holding that one element necessary for a State to be required to provide community-based services is that "the State's treatment professionals determine that such placement is *appropriate*") (emphasis added).

additional services would be needed to ensure that Boyd's needs are met. *Id.* ¶ 7. He also points to several of Boyd's past health issues, one of which required hospitalization. *Id.* ¶ 8. Essentially, Dr. Moon states that more care and more expertise than that requested by Boyd would be needed in order to monitor for and remedy these health issues should they occur again.

Commissioner Steckel is entitled to rely on Dr. Moon's assessment and conclude that the community-based services requested by Boyd are inappropriate for his needs. *Olmstead*, 527 U.S. at 602 ("The State generally may rely on the *reasonable assessments of its own professionals* in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program.").[16] Thus, "[i]t would be inappropriate to remove [Boyd] from the more restrictive setting"—at least until Boyd can demonstrate, at summary judgment or trial, that Dr. Moon's assessment is unreasonable or that he is still qualified for community-based services even under Dr. Moon's assessment.[17] *Id.* Without more at this stage, this Court cannot find that Boyd

---

[16] Boyd himself has presented no evidence from a medical professional that supports his views of what his needed medical services would be the community setting. Instead, he merely states what he believes his needs would be and asserts that his treating physician at the nursing home supports his decision to move out. Even without the conflicting evidence presented by Dr. Moon, this Court could not find these bare assertions sufficient to prove that the requested community-based services would be appropriate to meet Boyd's needs.

[17] The DOJ contends that the fact that Boyd lived in the community for eleven years demonstrates that community-based services are appropriate for his needs. (Doc. # 25 at 12). However, the record before this Court does not contain sufficient information to determine (1) what services Boyd actually received while his mother was his primary caregiver; (2) whether those services alone would be enough without his mother acting as primary caregiver; (3) what additional services, if any, would be needed for Boyd to live in the community; and (4) whether

has established a *substantial* likelihood of proving his qualification for the community-based services requested—i.e. that they are appropriate to meet his needs.[18]

Furthermore, according to the federal regulations, Alabama is entitled to exclude individuals from waiver programs where "there is a reasonable expectation that home and community-based services would be more expensive than Medicaid services the individual would otherwise receive." 50 Fed. Reg. 10,013. Attempting to prove that community-based services are cheaper than nursing home care, Boyd points to data showing that "Alabama's Medicaid nursing home reimbursement is approximately $33,700 a year" whereas the "Medicaid waiver for home and community-based services

_____

Boyd's medical needs have changed since he lived in the community. On such a barren record, this Court cannot find that the fact that Boyd lived in the community for eleven years with a relative acting as primary caregiver, in and of itself, establishes that community-based services are appropriate for his needs now.

[18] In support of Boyd's motion for a preliminary injunction, the DOJ places much emphasis on a recent case from the Middle District of Florida. (Doc. # 25, at 6 n.6) (citing *Haddad v. Arnold*, No. 3:10-cv-00414-MMH-TEM (M.D. Fla. July 9, 2010)); *see also id.* at 11. In *Haddad*, the court issued a preliminary injunction requiring the State to provide community-based services for a woman with quadriplegia. However, the facts of *Haddad* are easily—and pertinently—distinguishable from the instant case. In *Haddad*, the plaintiff pointed to a specific waiver, already in existence, which appeared to have open slots and provided the services requested by her. *Haddad*, at 27. The State did not dispute that she was qualified for that program. *Id.* Similarly, in *Olmstead*, the women qualified for a specific waiver program, in which slots were still available. 527 U.S. at 601.

Here, Boyd has failed to establish which specific waiver, if any, already provides the services he requests. Even looking to the E&D Waiver that Boyd discussed briefly, he has failed to establish how it provides all of the services he requested and/or would need to live in the community. Indeed, Commissioner Steckel contends that none of the existing waivers covers the community-based services requested by Boyd. *See* Doc. # 20, at 64; *see also* Doc. # 19 Ex. C, Chappelle Aff. ¶¶ 5–15. She also specifically contends that the E&D Waiver does not cover the equipment requested by Boyd or the skilled care that Dr. Moon determined he would need. (Doc. # 19 Ex. C, Chappelle Aff. ¶ 14). Boyd has done nothing to rebut this evidence at this stage.

[under the E&D Waiver] is approximately $10,365." (Doc. # 16, at 5). Thus, Boyd

claims that the use of community-based services saves Alabama and the federal

government approximately $22,000 a year. However, the data relied upon by Boyd refers

to cost-neutrality in the "average per capita expenditures," *not* cost-neutrality as it relates

to him in particular. (Doc. # 16 Ex. E, at 8). Commissioner Steckel contends that Boyd

would need significantly more hours of care, more expertise in care, and more services

and equipment then requested by Boyd or provided under the E&D Waiver in order to

live in the community. Given this dispute, the evidence provided by Dr. Moon, and the

lack of any evidence from a medical professional supporting Boyd's contentions as to his

needs, Boyd cannot establish a substantial likelihood of success on the issue of whether it

would be more cost-efficient to treat him in the community.

### b. *The Fundamental-Alteration Defense: the* Olmstead *Plurality*

Additionally, Boyd has failed to establish a substantial likelihood of success on the

allegedly reasonable modifications requested by him. The plurality in *Olmstead*

discussed the fundamental-alteration defense advanced by the State—namely, that all of

its available funds were already being used to provide services to other disabled

persons—and rejected the Court of Appeal's holding that the State must show that the

cost of providing community care to the women was unreasonable in comparison to its

entire mental health budget. 527 U.S. at 604. The plurality further clarified:

> [Such an interpretation] would leave the State virtually defenseless once it is
> shown that the plaintiff is qualified for the service or program she seeks. If the

> expense entailed in placing one or two people in a community-based treatment
> program is properly measured for reasonableness against the State's entire
> mental health budget, it is unlikely that a State, relying on the fundamental-
> alteration defense, could ever prevail. . . .  Sensibly construed, the
> fundamental-alteration component of the reasonable-modifications regulation
> would allow the State to show that, in the allocation of available resources,
> immediate relief for the plaintiffs would be inequitable, given the
> responsibility the State has undertaken for the care and treatment of a large and
> diverse population of persons with . . . disabilities.

*Id.* at 603–04 (emphasis added).  Noting that deinstitutionalization might never be

appropriate for some persons, the plurality made clear that the ADA was not designed to

eradicate institutions or to force deinstitutionalization on persons when it would be

inappropriate.  *Id.* at 604 ("[T]he ADA is not reasonably read to impel States to phase out

institutions, placing patients in need of close care at risk.  Nor is it the ADA's mission to

drive States to move institutionalized patients into an inappropriate setting . . . .").

In emphasizing the "leeway" that must be given to States to "maintain a range of

facilities and to administer services with an even hand," the plurality highlighted the

unfairness associated with ordering a State to deinstitutionalize one person under certain

circumstances.  *Id.* at 605.  For example, if a State demonstrates a "comprehensive,

effectively working plan for placing qualified persons with . . . disabilities in less

restrictive settings, and a waiting list that moved at a reasonable pace not controlled by

the State's endeavors to keep its institutions fully populated, the reasonable-modifications

standard would be met."  *Id.* at 605–06.  The plurality stated that courts could not allow

one to essentially line-jump such a program for providing community based services.  *Id.*

24

at 606 ("In such circumstances, a court would have no warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions.").

Thus, the plurality concluded that a State is required to provide community-based services for disabled persons when several factors are met: (1) "the State's treatment professionals determine that such placement is appropriate"; (2) "the affected persons do not oppose such treatment"; and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* at 607.  In addition to disputing the first element, Commissioner Steckel argues that Boyd's placement into the community would not be a reasonable accommodation, but rather would result in a fundamental alteration of Alabama's Medicaid system. *See* Doc. # 20, at 61–65.

Assuming that Boyd does qualify for an existing waiver program or for a modified waiver program, this Court must be mindful of the limitations on the *Olmstead* plurality's discussion of the fundamental-alteration defense.  Boyd has averred that the E&D Waiver—which Commissioner Steckel disputes whether Boyd is qualified to be under—is capped at 9,205 people and has been at that cap since 2008.  The DOJ contends that Alabama need only request an increase in the cap for a particular waiver program in order to comply with the ADA.  (Doc. # 25, at 9).  However, the Medicaid waiver program at issue in *Olmstead* had unused slots open.  527 U.S. at 601.  Thus, the

25

*Olmstead* Court "did not consider whether a forced change in the waiver program's cap would constitute a fundamental alteration, because the [S]tate's program in that case was far from full." *Arc. of Wash. State Inc. v. Braddock*, 427 F.3d 615, 619 (9th Cir. 2005).

Although there is no applicable precedent from the Eleventh Circuit, other circuits have addressed the issue of what would constitute a fundamental alteration, with seemingly conflicting results. For example, the First Circuit has stated that "in no event is the [State] required to undertake measures that *would pose an undue financial or administrative burden* . . . or effect a fundamental alteration in the nature of the service." *Toledo v. Sanchez*, 454 F.3d 24, 39 (1st Cir. 2006) (emphasis added), cert. denied, *Univ. of P.R. v. Toledo*, 549 U.S. 1301 (2007). On the other hand, the Third Circuit has held that budgetary constraints, "[t]hough clearly relevant," are alone "insufficient to establish a fundamental alteration defense." *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3rd Cir. 2005) (citations omitted). Going further, the Ninth Circuit has held that "[o]ne basis for finding a 'fundamental alteration' would have been for the [S]tate to demonstrate that the remedy would force it 'to apply for additional Medicaid waivers in order to provide community-based services" to the plaintiffs. *Id.* (quoting *Townsend v. Qausim*, 328 F.3d 511, 519 (9th Cir. 2003)); *see also Bruggeman v. Blagojevich*, No. 00 C 5392, 2004 U.S. Dist. LEXIS 276 at *15 (N.D. Ill. Jan. 8, 2004) (rejecting the argument that a court can consider the fact that the State can "request additional waiver slots to expand community-based services" as part of the State's

available resources because it is "beyond the scope of inquiry permissible under

*Olmstead*").

Requiring Alabama to seek more waiver slots could very well be a fundamental

alteration as the Ninth Circuit has held.  Were this Court to grant a preliminary injunction

here, nothing would prevent these other thousands of persons on the waiting lists from

filing lawsuits and being granted preliminary injunctions that essentially increase the

waiver cap.  *Cf. Long v. Benson*, No. 4:08cv26-RH/WCS, 2008 WL 4571903 at *2 (N.D.

Fla. Oct. 14, 2008) ("[C]ommon sense and experience suggest there is nothing that can be

done for [the plaintiff] in a nursing home that cannot also be done in his apartment

complex.  Indeed, this is true of most if not all services provided in nursing homes for

most if not all patients."), affirmed, No.08-16261, 2010 WL 2500349 (11th Cir. June 22,

2010).  Such a result would hardly render preliminary injunctions a drastic and extreme

remedy.  Furthermore, it could potentially disrupt the entire balance of the Alabama

Medicaid program, rendering the permissible caps illusory and requiring Alabama to

provide community-based services to anyone and everyone who qualifies for a particular

Medicaid waiver program or a modified version of that program.[19]  *See Olmstead*, 527

---

[19] In *Haddad*, the Middle District of Florida considered similar arguments about the apparent conflict between the ADA and the Rehabilitation Act's anti-discrimination provisions—as applied by the *Olmstead* Court to prevent unnecessary institutionalization—and the Medicaid Act—which has a extensive regulatory and statutory scheme that permits capped waiver programs.  Rejecting the State's contentions that there was a conflict, the court concluded that the plaintiff's claim "simply addresses the question of whether these Defendants, having opted to provide particular services via the mechanism of a Medicaid Waiver Program, may be required, under the ADA, to provide those same services to [the plaintiff] if necessary to avoid

U.S. at 604 ("[T]he ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk).[20]

Additionally, nothing in the record establishes whether the waiting list "move[s] at a reasonable pace not controlled by [Alabama's] endeavors to keep its institutions fully populated." *Olmstead*, 527 U.S. at 605–06. Simply stating that the waiver program is capped, which is permitted under the Medicaid Act, does not mean that this is anything but "a comprehensive, effectively working plan." *Id.* Although Alabama bears the burden of establishing the existence of such a program, this Court cannot find—on the record before it—that there is a substantial likelihood that Alabama will not be meet this

---

imminent, unnecessary institutionalization." *Haddad* at 29.

Because *Haddad* is factually distinguishable from this case—neither party disputed the plaintiff's qualifications for a particular waiver program which may have had open slots—this Court is not convinced that the issue is so narrow in the instant case, particularly given the *Olmstead* Court's holding that the courts must look at the big picture. 527 U.S. at 606 (requiring courts to consider whether "the placement can be reasonably accommodated, *taking into account the resources available to the State and the needs of others with . . . disabilities*") (emphasis added). Thus, the potential impact of a grant of preliminary injunctive relief on the State's Medicaid program, and its waiver programs in particular, is an appropriate consideration.

To be clear, this Court is not holding that the ADA and the Rehabilitation Act do not apply to a State who chooses to have Medicaid. However, this Court is not convinced that the intended interaction between the statutes is such that States who choose to have Medicaid and who choose to use optional waiver programs must therefore provide such community-based services to all persons who could benefit from them even when the waiver programs are full.

[20] For these same reasons, this Court finds that the balance of hardships does not favor granting a preliminary injunction and that it would not be in the public interest to grant such injunctive relief at this stage. Without a more developed record and an opportunity to more fully brief the issues, the grant of preliminary injunctive relief poses a grave risk of setting precedent which could undermine Alabama's Medicaid scheme, negatively impacting those other disabled persons receiving Medicaid funds. For these additional reasons, the motion is due to be DENIED.

burden.  *Cf. Townsend*, 328 F.3d at 519 (reversing summary judgment for the State because the "current record [did] not provide [the court] with sufficient information to evaluate the . . . fundamental alteration defense").

Finally, Boyd has not pointed to anything—nor can this Court find anything—that would distinguish him from the other thousands of persons on waiting lists for community-based services under Alabama's Medicaid program.  Permitting Boyd to jump ahead of others on the waiting list merely because he filed a lawsuit goes against the express language of the *Olmstead* plurality, which this Court will not do.  *See Olmstead*, 527 U.S. at 606 ("In such circumstances, a court would have *no warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions*.") (emphasis added).  Given the fragmented nature of the *Olmstead* opinion, the lack of guidance as to what constitutes a fundamental alteration, and the potential conflict between the Medicaid Act and the ADA and Rehabilitation Act, this Court cannot find that Boyd has established a *substantial* likelihood of success on the merits as to whether the relief he seeks would constitute a reasonable modification or a fundamental alteration.  The uncertainty is heightened by the fact that Boyd seeks a mandatory preliminary injunction requiring him to satisfy a heightened burden.[21]

---

[21] Even if his pleadings could be construed as seeking a typical prohibitory injunction, Boyd still cannot establish the substantial likelihood of success on the merits *sufficient to upset the status quo in this case*.

**CONCLUSION**

For the foregoing reasons, it is hereby ORDERED that the motion for a

preliminary injunction, (Doc. # 15), is DENIED.

DONE this  day of November, 2010.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE